UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -x
                                        :
PATRICK MORIN, as President of the      :
EMPIRE STATE REGIONAL COUNCIL OF        :
CARPENTERS, and JOHN FUCHS,             :
PATRICK MORIN, ANTHONY MACAGNONE,       :
MICHAEL CONROY, DAVID HAINES,           :
GEOFFREY JAMES, JAMES MALCOLM,          :         **OPINION**
WILLIAM MACCHIONE, WALTER KRUPA,        :
ALAN EHL, WILLIAM WEITZMAN, JOSEPH      :         04 Civ. 3756 (DC)
OLIVIERI, DALE STUHLMILLER, ARTHUR      :
GODSELL, ROBERT CARLINO, PAUL J.        :
O'BRIEN, JR., JOSEPH GANIRO, ROSS       :
PEPE, RICHARD O'BEIRNE, and JAMES       :
LOGAN, as Trustees of the EMPIRE        :
STATE CARPENTERS WELFARE, PENSION,      :
VACATION, ANNUITY, SCHOLARSHIP,         :
LABOR-MANAGEMENT COOPERATION,           :
APPRENTICE-TRAINING and CHARITABLE      :
TRUST FUNDS,                            :

                  Plaintiffs,           :

            - against -                 :

EMPIYAH & COMPANY, LLC and GULF         :
INSURANCE COMPANY,                      :
                                        :
                  Defendants.           :
- - - - - - - - - - - - - - - - - - -x

**APPEARANCES:**    MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
                    Attorneys for Plaintiffs
                          By:  John H. Byington III, Esq.
                    425 Broadhollow Road, Suite 405
                    Melville, New York  11747

                    McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
                    Attorneys for Defendant Gulf Insurance Company
                          By:  Michael McDermott, Esq.
                    88 Pine Street, 24th Floor
                    New York, New York  10005

**CHIN, D.J.**

        This is an action for recovery of unpaid wages and

benefits for carpentry work performed on the construction of a

new clubhouse for the Stony Point Golf Club in Stony Point, New

York.  Plaintiffs brought claims against the contractor and its surety under the Labor Management Relations Act, 29 U.S.C. § 185, the Employee Retirement Income Security Act, 29 U.S.C. § 1001 <u>et seq.</u>, and New York State Finance Law § 137 ("Section 137").  Before the Court is plaintiffs' motion for summary judgment on their claim against the surety, defendant Gulf Insurance Company ("Gulf").

<b><u>STATEMENT OF THE CASE</u></b>

**A.  <u>The Facts</u>**

      **1.  <u>The Parties</u>**

Plaintiffs in this action are Patrick Morin, who brings this action in his representative capacity as president of the Empire State Regional Council of Carpenters (the "Union") on behalf of numerous carpenter members of the Union[1] who allegedly are owed wages for work performed on the construction project, and various other named plaintiffs, who sue as trustees of union trust funds (the "Funds") that are allegedly owed fringe benefit payments as a result of the hours worked by the carpenters.

Defendants are Empiyah & Company ("Empiyah"), which was a carpentry contractor on the construction project, and Gulf, Empiyah's surety on the project.  A summary of the relevant facts

---

[1]    The carpenters are Michael Alvarado, Thomas Beauregard, Jr., Bryan Bednar, Brian Dowd, John England, Tom Golebiowski, James Gormley, Edgar Judge, Dominick Marku, Jack Morgan, Michael Mulligan, Miguel Santiago, Emil Sanchez, Patrick Sheridan, Bob Starkey, Jr., Larry Valentino, and Karl Roeth.  The carpenters have each submitted an affidavit setting forth the days and hours for which they assert that they are owed wages.  These affidavits will be cited herein as "Employee Affs. ¶ __."

follows.

## 2. **Background**

In April of 2003, the Town of Stony Point (the "Town") hired Empiyah to perform carpentry work on the construction of a clubhouse at the Stony Point Golf Club. (Craven Aff. ¶ 4). In connection with that project, Empiyah hired numerous Union-member carpenters to perform the required carpentry work. (Id.). Empiyah and the Union were parties to a Collective Bargaining Agreement (the "CBA") that governed the period from May 1, 2001, to April 30, 2004. (Id. ¶ 3). The CBA required Empiyah to pay the carpenters specified wages, and also required Empiyah to make certain specified fringe-benefit contributions to the Funds on the carpenters' behalf. (CBA §§ 5, 10).

On June 9, 2003, a labor and material bond (the "Bond") in the amount of $1,228,000.00 was executed and issued by Gulf as Surety for the benefit of Empiyah as Principal and the Town as Obligee. (Bond at 6). The Bond provided that

> every claimant . . . who has not been paid in
> full before the expiration of a period of
> ninety (90) days after the date on which the
> last of such claimant's work or labor was
> done or performed . . . may sue on this bond
> for the use of such claimant, prosecute the
> suit to final judgment for such sum or sums
> as may be justly due claimant, and have
> execution thereon.

(Bond ¶ 2). A "claimant," in turn, is defined as

> one having a direct contract with the
> Principal . . . for labor, material, or both,
> used or reasonably required for use in the
> performance of the Contract, labor and
> material being construed to include that part
> of water, gas, power, light, heat, oil,

> gasoline, telephone service or rental of
> equipment directly applicable to the
> Contract.[2]

(Bond ¶ 1).

From the beginning of the project until October 2003, Empiyah issued regular paychecks to the carpenters without incident, but was not always so timely with payments for fringe benefits. (Craven Reply Aff. ¶ 5). As of Friday, October 17, 2003, Empiyah was several weeks delinquent in fringe benefits payments, and Richard Craven, a Council Representative of the Union who is responsible for overseeing construction projects performed within his geographic area (including the Town), attended a number of meetings with Empiyah and the Town on October 20 and 21, 2003, to address the delinquency. (Craven Aff. ¶ 2; Craven Reply Aff. ¶ 2, 5-7). As a result of the meetings, the Town agreed to issue a check for $51,069.34 to cover delinquent benefits payments through October 17, 2003. (Craven Reply Aff. ¶ 6). Craven picked up the check personally on October 21, 2003. (<u>Id.</u> ¶ 7).

Then, on October 23, 2003, several carpenters attempted to cash their paychecks for work performed during the period from October 12-18, 2003, and found that there were insufficient funds to cover the checks. (Craven Aff. ¶ 7). The same day, the Empiyah-employed carpenters protested the dishonored paychecks by

---

[2] The "Contract" referred to in this definition refers to the contract between Empiyah and the Town by which Empiyah was retained to perform the carpentry work on the construction project. (Bond at 6).

staging a strike for the final two hours of the day. (<u>Id.</u> ¶ 8).
The strike continued on Friday, October 24, Monday, October 27,
and Tuesday, October 28, for a total of three work days, plus the
two hours on the 23rd. (<u>Id.</u>) It is apparently not in dispute
that no work was performed after the 23rd, and no Empiyah-
employed carpenters were at the job site for any reason, strike
or otherwise, after the 28th. (<u>See</u> Byington Decl. Ex. 5).

As to the Union members' right to strike, the CBA
provided that:

> The Union is granted all absolute right
> to strike the job of any delinquent
> contractor. The union shall be under no
> compulsion to return carpenters to employment
> with such contractors until all delinquencies
> are completely paid in full. Where such
> action is the result of the delinquency of
> any contractor in payment of wages or any of
> the Fringe Benefit payments set forth
> elsewhere in this Agreement, such delinquent
> contractor shall be required to pay the
> striking employees wages for each day on
> strike, for a period not to exceed three (3)
> days prior to their return to their
> employment for such contractor.

(CBA § 14).

Shortly after the end of the strike, by letter dated
October 31, 2003, plaintiffs' counsel informed the Town attorney
of Empiyah's non-payment of wages. (Byington Decl. Ex. 1). On
November 4, 2004, plaintiffs' counsel sent a similar letter to
Gulf to provide notice of the carpenters' claim against the Bond.
(<u>Id.</u>). After some communication between plaintiffs' counsel and
counsel for Gulf, in December 2003 Gulf issued checks to cover
the wages owed to the carpenters by Empiyah for the pay period

from October 12-18, 2003.[3] (Craven Aff. ¶ 7; Byington Decl. Exs. 6 & 7).

Plaintiffs now assert that wages and fringe benefits in the amount of $46,673.28 remain unpaid for work performed from October 19-23, 2003, as well as for the strike dates, which encompassed two hours on the 23rd and full days on the 24th, 27th, and 28th.[4]

Gulf, for its part, does not dispute liability for hours actually worked, but asserts that it has paid all fringe benefits through October 21, 2003, and that it has not paid plaintiffs' claims for October 20-23, 2003, because plaintiffs' claims to have worked these days "cannot be verified" because plaintiffs' submissions "do not match the daily reports maintained by the Town of Stony Point." (McDermott Affirmation ¶ 12). Furthermore, Gulf denies that it is required under the Bond to pay for the strike time because it asserts that the Bond only requires it to cover delinquencies for hours actually worked. (Def. Mem. of Law at 3).[5]

## B. **Procedural History**

---

[3]     The one exception is carpenter Thomas Beauregard, Jr., who asserts that he is owed wages for work performed from October 12-28, 2003. (Beauregard Aff. ¶ 8).

[4]     Although the complaint demands $46,673.28, plaintiffs' summary judgment motion requests that summary judgment be entered in their favor in the amount of $45,740.88. (Pl. Mem. of Law at 17). The reason for the discrepancy is unclear.

[5]     Gulf's Memorandum of Law in Opposition to summary judgment has no page numbers. The Court has counted the pages to provide citations to page numbers.

Plaintiffs commenced this action by filing a complaint on May 18, 2004.  Gulf answered on June 28, 2004, substantially denying the allegations of the complaint, and asserting a cross-claim against Empiyah, alleging that Empiyah was required to indemnify Gulf for any payments it ultimately had to make under the Bond.  Empiyah has never appeared in this action, and on November 22, 2004, the Court entered a default judgment against Empiyah and in favor of plaintiffs in the amount of $52,691.64. Gulf is therefore the only remaining defendant.

On March 4, 2005, plaintiffs moved for summary judgment against Gulf on their claim that Gulf is obligated under the Bond to pay $45,740.88, representing $25,728.08 in wages and $20,012.80 in fringe benefits, purportedly due from Empiyah under the CBA.

## DISCUSSION

### A.   Subject Matter Jurisdiction

Although plaintiffs brought several federal claims against Empiyah, as to Gulf they assert only the claim for payment under the Bond.  The Court originally had supplemental jurisdiction over this claim under 28 U.S.C. § 1367, which, in cases in which district courts have original jurisdiction, confers jurisdiction over "claims that involve the joinder or intervention of additional parties."  28 U.S.C. § 1367(a).  The question thus arises whether the Court should continue to exercise jurisdiction over the remaining state-law claim.

Section 1367(c) allows the Court to decline to exercise

supplemental jurisdiction if

> (1) the claim raises a novel or complex issue
> of State law,

> (2) the claim substantially predominates over
> the claim or claims over which the district
> court has original jurisdiction,

> (3) the district court has dismissed all
> claims over which it has original
> jurisdiction, or

> (4) in exceptional circumstances, there are
> other compelling reasons for declining
> jurisdiction.

28 U.S.C. § 1367(c). Here, clauses (1) and (2) do not apply, as

the issue of whether the Bond requires Gulf to cover Empiyah's

non-payment is not, in the Court's judgment, an issue of state

law so novel or complex to justify declining jurisdiction, and

the one state-law claim does not predominate over the federal

claims.

Section 1367(c)(3) allows a district court to decline

to exercise jurisdiction if all federal claims have been

dismissed. Here, a default judgment has been entered on the

federal claims against Empiyah. In this situation, one court has

written that

> [f]ar from determining that the federal claim
> was unfounded, the court's default judgment
> represents its determination that the federal
> claim was well-founded. The simple fact that
> there was nothing left to litigate on the
> merits of that claim does not mean that the
> claim was dismissed. As the federal claim
> . . . was not dismissed, the exercise of
> discretion [to decline jurisdiction] was not
> authorized by § 1367(c)(3).

Trs. of Constr. & Laborers Health & Welfare Trust v. Desert

<u>Valley Landscape & Maintenance</u>, 333 F.3d 923, 926 (9th Cir. 2003).  This Court agrees.

Finally, the Court may decline to exercise supplemental jurisdiction "in exceptional circumstances."  28 U.S.C. § 1367(c)(4).  The Second Circuit has explained that this "catch-all" provision requires "compelling" circumstances, such that "declining jurisdiction outside the ambit of 1367(c)(1)-(3) appears as the exception rather than the rule."  <u>Itar-Tass Russian News Agency v. Russian Kurier, Inc.</u>, 140 F.3d 442, 448 (2d Cir. 1998).  This case presents no such circumstances.

Accordingly, I conclude that the Court has jurisdiction to resolve the claim for payment under the Bond.[6]

**B.    The Merits**

**1.    Applicable Law**

---

[6]    In addition, I conclude that plaintiffs, who bring this action as officers and trustees of the Union and various of its trust funds, have standing to sue on behalf of the carpenters. In general, an association has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members of the lawsuit."  <u>Hunt v. Wash. State Apple Adver. Comm'n</u>, 432 U.S. 333, 343 (1977).  The parties have not briefed the issue, but the only prong that could seriously be contested is the third -- whether the participation of the individual carpenters is required.  Although it has been suggested that in some cases suits for damages might not satisfy the third prong, <u>see</u> <u>Inter'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock</u>, 477 U.S. 274, 287-88 (1986), in this case the uncontroverted affidavits of the plaintiffs provide a sufficient basis on which to resolve the case without the individual participation of each carpenter.  In any event, the third prong is prudential, and not constitutionally required.  <u>United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.</u>, 517 U.S. 544, 557-58 (1996).

### a.  **Summary Judgment Standard**

Summary judgment will be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585-87 (1986).  Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party."  <u>Id.</u> at 248; <u>accord Bay v. Times Mirror Magazines, Inc.</u>, 936 F.2d 112, 116 (2d Cir. 1991).

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  <u>Matsushita Elec. Indus.</u>, 475 U.S. at 586.  There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor.  <u>Anderson</u>, 477 U.S. at 249-50.  As the Court held in <u>Anderson</u>, "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  <u>Id.</u> (citations omitted).

### b.  **Section 137**

The labor and materials bond issued by Gulf was required under Section 137.[7]  In pertinent part, Section 137 provides:

> [i]n addition to other bond or bonds, if any, required by law for the completion of work specified in a contract for the prosecution of a public improvement . . . [the] appropriate official . . . shall . . . require prior to the approval of any such contract a bond guaranteeing prompt payment of moneys due to all persons furnishing labor or materials to the contractor or his subcontractors in the prosecution of the work provided for in such contract.

New York State Finance Law § 137(1) (McKinney 2004).  As to what non-payments are covered by the bond, the statute provides that

> [t]he expression "moneys due to persons furnishing labor to the contractor or his subcontractors" includes all sums payable to or on behalf of persons furnishing labor to the contractor or his subcontractors, for wages, health, welfare, non-occupational disability, retirement, vacation benefits, holiday pay, life insurance or other benefits, payment of which is required pursuant to the labor law or by the contract in connection with which the bond is furnished or by a collective bargaining agreement between organized labor and the contractor or subcontractor, and which are computed upon labor performed in the prosecution of the contract.

New York State Finance Law § 137(5)(b) (McKinney 2004).

In enacting Section 137, "the Legislature intended to supplement the Lien Law and to guarantee payment through a bond

_____

[7]  A bond on a public improvement project such as the one at issue here is deemed issued pursuant to Section 137 and subject to its provisions even where, as here, it does not specifically refer to the State Finance Law.  <u>Harsco Corp. v. Gripon Constr. Corp.</u>, 752 N.Y.S.2d 59, 62 (2d Dep't 2002) (citations omitted).

to persons furnishing labor and material on public improvement projects even though there are insufficient funds against which a lien could be filed." <u>Harsco Corp. v. Gripon Constr. Corp.</u>, 752 N.Y.S.2d 59, 62 (2d Dep't 2002); <u>see also</u> <u>Graham Architectural Prods. Corp. v. St. Paul Mercury Ins. Co.</u>, 303 F. Supp. 2d 274, 283 (E.D.N.Y. 2004) ("[P]ayment bonds reflect a strong policy of safeguarding the efforts of suppliers of labor and materials and are to be liberally construed in accordance with their remedial purpose.").  Thus, a bond issued pursuant to Section 137 is intended to guarantee payment for labor or material performed or provided "'in the prosecution of the work provided for in such contract.'"  <u>Harsco</u>, 752 N.Y.S.2d at 62 (quoting New York State Finance Law § 137(1) (McKinney 2004)).  The statutory text is read into the instrument.  <u>Id.</u> (citations omitted).

      2.  **Application**

        a.  **The Non-Strike Days: October 20-23**

Plaintiffs have submitted seventeen affidavits from employees who state that they are owed wages for hours worked during the week of October 20, 2003, prior to the commencement of the strike on the afternoon of October 23.  In addition, plaintiffs have submitted an affidavit from Richard Craven, who states that the seventeen carpenters are owed wages for hours worked between October 20-23, 2003.  (Craven Aff. ¶ 15). Finally, plaintiffs have submitted detailed Shop Stewards Weekly Payroll Reports for the month of October 2003, which reports list the seventeen carpenters, the days they worked, and the hours

they worked each day, including October 20-23, 2003. (See Byington Decl. Ex. 5).

Gulf apparently does not dispute that the carpenters have not received payment for these work days. (See Def. Mem. of Law at 7 ("Plaintiffs are not entitled to recover wages or benefits from Gulf Insurance for the time when they were on strike after Empiyah last performed work on the project. <u>This leaves, at best, a period of three and a half days when plaintiffs may not have been paid their wages</u> . . . .") (emphasis added)). As justification for not having paid the claims for work performed on October 20-23, Gulf submits the affidavit of Roger Rowe, a member of a consulting firm retained by Gulf to investigate the carpenters' claims. Rowe states that "[p]laintiffs' claims with respect to the week starting on Monday, October 20, 2003 cannot be verified because plaintiffs' allegations and records do not match the daily reports maintained by the Town of Stony Point. For example, the Town's records do not show that any work was performed on Tuesday, October 21, 2003." (Rowe Aff. ¶ 8). Gulf has not submitted the Town's records as part of the record in this case.

This is plainly insufficient to defeat plaintiffs' motion for summary judgment. Federal Rule of Civil Procedure 56(e) requires that affidavits in support of and against summary judgment "shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence." Fed. R. Civ. P. 56(e); <u>see also</u> <u>Raskin v. Wyatt Corp.</u>, 125 F.3d 55, 66

(2d Cir. 1997) ("'Since the object [of summary judgment] is to discover whether one side has no real support for its version of the facts, the Rule specifically states that affidavits shall "set forth such facts as would be admissible in evidence."'") (quoting <u>Cmty. of Roquefort v. William Faehndrich, Inc.</u>, 303 F.2d 494, 498 (2d Cir. 1962)). Rowe's affidavit, to the extent it purports to state facts about the Town's records that contradict the seventeen sworn employee affidavits, the Craven Affidavit, and the time sheets, is inadmissible hearsay that purports to assert the truth of an out-of-court document. <u>See</u> <u>Raskin</u>, 135 F.3d at 66 ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.").

Rowe's affidavit aside, there is simply nothing in the record to contradict the carpenters' sworn affidavits and time-sheets, apart from "conclusory statements, conjecture, or speculation [that] are inadequate to defeat a motion for summary judgment." <u>Woodman v. WWOR-TV, Inc.</u>, 411 F.3d 69, 85 (2d Cir. 2005) (citations omitted). Accordingly, summary judgment is granted for the plaintiffs as to wages due for the hours actually worked by the carpenters, as reflected in the employee affidavits and the Shop Stewards Weekly Payroll Reports, from October 20-23, 2003. For the same reasons, summary judgment is granted for the plaintiffs on the claim for Thomas Beauregard's wages and fringe benefits that extends back to October 12, 2003.

In similar fashion, Gulf points to an Apprentice Stamp Order Form that indicates that the plaintiffs received a check

-14-

from the Town in the amount of $51,069.34 on October 21, 2003, and argues that this indicates that the plaintiffs have been paid for all fringe benefits "due on or before" that date. (McDermott Affirmation in Opposition ¶¶ 10-12 & Ex. 3). As explained above, plaintiffs have submitted a reply affidavit from Richard Craven, who states that (a) as of Friday, October 17, 2003, Empiyah was behind several weeks in fringe benefits payments, (b) he personally attended a number of meetings with Empiyah and the Town on October 20-21, 2003, to address this delinquency, (c) as a result of the meetings, the Town agreed to issue a check for $51,069.34 to cover fringe benefits through October 17, 2003, and (d) he personally picked up the check on October 21, 2003, which explains why the check he received was dated as of that date. (Craven Reply Aff. ¶¶ 5-7). Gulf has submitted nothing to contravene this affidavit. On this record, no reasonable jury could find anything but that the check covered the fringe benefits only through October 17, 2003. Accordingly, summary judgment is granted to plaintiffs on their claim for fringe benefits, as well as wages.

### b. Strike Days: Oct. 24, 27, and 28, 2003

A closer question is whether Gulf is required to pay the carpenters for the time they spent striking Empiyah after their paychecks bounced. Plaintiffs point out that the CBA provided that the Union was granted "all absolute right to strike the job of any delinquent contractor," and that such delinquent contractor "shall be required to pay the striking employees wages

-15-

for each day on strike, for a period not to exceed three (3)
days." (Pl. Reply Mem. of Law at 8 (quoting CBA § 14)).
Plaintiffs further argue that under New York law, "the liability
of [Gulf], as a compensated corporate surety, is measured by the
liability of its principal Empiyah." (Pl. Mem. of Law at 11
(citing Am. Building Supply Corp. v. Avalon Props., Inc., 779
N.Y.S.2d 517, 519 (2d Dep't 2004) ("The liability of National
Union as the surety is measured by the liability of the general
contract, its principal.")).

Gulf, on the other hand, argues that Section 137
provides that sureties that issue bonds are responsible only for
wages and benefits "due to all persons furnishing labor to the
contractor . . . which are computed upon labor performed in
prosecution of the contract." (Def. Mem. of Law at 3 (quoting
Section 137(5)(b)). Gulf therefore argues that it should not be
required to pay for the time the carpenters spent on strike,
because "the strike did not further the work on the project and
was in no way necessary to the work on the project." (Id.).
Gulf asserts that its liability is not co-extensive with
Empiyah's liability because payment for strike time was a
contractual penalty against Empiyah, and that sureties are
typically not liable for contractual penalties. (Def. Mem. of
Law at 4 (citing Greenblatt v. Delta Plumbing & Heating Corp.,
849 F. Supp. 247, 250-51 (S.D.N.Y. 1994)).

The Court is aware of no cases, and the parties have
cited none, addressing the issue of whether strike time is

compensable under circumstances similar to those presented here. The Court holds that, as a matter of law, plaintiffs are entitled to summary judgment under these facts. First, Section 137 is remedial in nature, and was enacted "[in] an apparent effort to afford greater protection to laborers and materialmen on public improvement contracts." Chittenden Lumber Co. v. Silberblatt & Lasker, 288 N.Y. 396, 400 (1942). Its purpose is to address "the lack of protection given by the Lien Law to those who furnish materials in connection with State contracts." Id. at 403. Thus, the minimum protections it provides to laborers and those who furnish materials should not be construed as a bar to recovery for greater protections -- such as recovery for strike time -- fairly negotiated by the parties. This is especially so in a case where the strike was in response to non-payment of wages by the contractor, and was not employed as a negotiation tactic by the Union.

Second, although Gulf argues that it is liable under the Bond only for labor actually performed, "claims under payment bonds issued pursuant to § 137 are not conditioned on whether amounts were due under the prime contract, but rather on whether labor or materials have been 'furnished.'" Graham Architectural Prods. Corp. v. St. Paul Mercury Ins. Co., 303 F. Supp. 2d 274, 279 (E.D.N.Y. 2004) (emphasis added). Thus, the carpenters are entitled to payment for the labor that they "furnished," even if it was not actually performed because of the strike. Support for this holding is found in cases interpreting the Miller Act, 40

-17-

U.S.C. § 3131, the federal counterpart to Section 137, which "extend[s] protections to those whose labor and materials were made available for use in the project, <u>even if their labor or materials were not actually used in the project.</u>"  <u>Id.</u> at 280 (emphasis added).[8]

There being no statutory bar to recovery for the strike time, the question is whether the text of the Bond, when read in conjunction with the CBA, provides for recovery under these circumstances.  Under New York law, Gulf's liability is measured by the liability of Empiyah, its principal.  <u>See, e.g.</u>, <u>Am. Bldg. Supply Corp. v. Avalon Props., Inc.</u>, 779 N.Y.S.2d 517, 519 (2d Dep't 2004) ("The liability of National Union as the surety is measured by the liability of the general contractor, its principal."); <u>Venus Mech., Inc. v. Ins. Co. of N. Am.</u>, 667 N.Y.S.2d 60, 61 (2d Dep't 1997) ("The liability of INA as the surety is measured by the liability of Humphreys, its principal . . . ."); <u>Lamparter Acoustical Prods. Ltd. v. Md. Cas. Co.</u>, 407 N.Y.S.2d 579, 580 (2d Dep't 1978) ("It is fundamental that a surety's liability on a contractor's payment bond is limited to the liability of the contractor.").  The liability of the surety, however, is to be construed narrowly, as the liability of a guarantor "is strictissimi juris, which means that it shall not extend beyond the precise stipulations of the guaranty."  <u>Rieser</u>

_____

[8]     "Consideration of pertinent Miller Act cases is appropriate because New York courts treat Miller Act decisional law as precedential."  <u>Graham Architectural Prods. Corp.</u>, 303 F. Supp. 2d at 280.

<u>v. Speyer</u>, 267 N.Y.S. 670, 672 (1st Dep't 1933).  The question is therefore whether liability for strike time is the type of liability that was contemplated by Gulf when it entered into the Bond with Empiyah as its principal.

Here, although Gulf argues that it should not be liable for strike time because it was not a party to the CBA (Def. Mem. of Law at 6), the Bond -- which was issued by Gulf -- specifically grants any claimant "who has not been paid in full" the right to sue on the Bond "for such sum or sums as may be justly due."  (Bond ¶ 2).  A "claimant," in turn, is "one having a direct contract with the Principal . . . for labor, material, or both, used or reasonably required for use in the performance of the Contract." (Bond ¶ 1).  Thus, the Bond by its terms grants the carpenters the right to sue for "sums justly due" under the CBA, even though Gulf was not a signatory of the CBA.  Because the CBA provided that the Union members had "all absolute right to strike the job of any delinquent contractor," and that "such delinquent contractor shall be required to pay the striking employees wages for each day on strike, for a period not to exceed three (3) days" (CBA § 14), Empiyah would have been liable for the strike time.  Accordingly, Gulf, as Empiyah's surety, is liable to the same extent.[9]

_____

[9]     The cases cited by Gulf at pages 5-6 of its memorandum of law are not to the contrary.  In <u>Greenblatt v. Delta Plumbing & Heating Corp.</u>, the issue was whether the surety, in addition to being responsible for fringe benefits, was also responsible for penalties of 18% interest and 20% liquidated damages for late payment of fringe benefits.  849 F. Supp. 247, 249-50 (S.D.N.Y. 1994), <u>vacated</u>, 68 F.3d 561 (2d Cir. 1995).  The court held that

-19-

For the same reasons, Gulf is required to pay the workers for the two hours of strike time on the afternoon of October 23, 2003. Although the CBA only provided for a maximum of three days' payment for strike time, another section of the CBA provided that "should [a carpenter] commence work after the lunch period, he must be paid for the full day." CBA § 6(c). As the uncontroverted employee affidavits establish that the carpenters did commence work on the afternoon of the 23rd, and only struck for the last two hours of the day, they are entitled to payment for the full work day on the 23rd. Accordingly, plaintiffs' motion for summary judgment is granted.

---

it was not, because "the bond [did] not express the clear intent of the parties that, in addition to the fringe benefits listed in the CBA, [the surety] should be liable for all penalties assessable . . . for a failure to pay fringe benefits." Id. at 250. Here there is nothing in the CBA to suggest that payment for strike time is a "penalty" along the lines of an 18% interest rate and liquidated damages provision, such as in Greenblatt. Graham Architectural Prods. Corp. v. St. Paul Mercury Ins. Co. and 5 Star Builders, Inc. v. Novel Iron Works were cases in which sureties were found not to be responsible for materials that were not actually furnished. 303 F. Supp. 2d 274, 283 (E.D.N.Y. 2004) ("When a party deliberately chooses to refuse to furnish materials . . . it has satisfied neither the requirement of the bond nor the underlying purpose of the statute."); 702 N.Y.S.2d 40, 40 (1st Dep't 2000). Here, the carpenters actually furnished labor, and only did not work because Empiyah wrongfully refused to pay.

## CONCLUSION

For the reasons set forth above, plaintiffs' motion for summary judgment is granted. The Clerk of the Court shall enter judgment in favor of plaintiffs and against Gulf in the sum of $45,740.88, with interest and costs.

SO ORDERED.

Dated:    New York, New York
         September 28, 2005

DENNY CHIN
United States District Judge